DAVID A. THOMAS (SBN 215367)
DThomas@BlankRome.com
SARAH L. EDRI (SBN 310531)
SEdri@BlankRome.com
BLANK ROME LLP
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:  424.239.3434

Attorneys for Plaintiffs
Lyle Turner and Alison Turner

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYLE TURNER and ALISON TURNER,<br><br>Plaintiffs,<br><br>vs.<br><br>FEDERAL INSURANCE COMPANY, an Indiana corporation,<br><br>Defendant. | Case No. 2:20-cv-851<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **Breach of Contract**<br>2. **Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Plaintiffs Lyle Turner and Alison Turner, husband and wife (together, "Plaintiffs" or the "Turners"), complain of defendant Federal Insurance Company ("Defendant" or "Chubb" or the "Insurer") and allege as follows:

**INTRODUCTION**

1. This civil action is brought by a Santa Barbara-area couple, Lyle and Alison Turner, against their homeowners insurer, Chubb, for breach of contract and tortious breach of the implied covenant of good faith and fair dealing (commonly known as "bad faith") for wrongfully depriving them of substantial insurance proceeds and handling their claim unreasonably. The Turners suffered a total loss of their home in Montecito, California, in January 2018 when devastating mudslides caused by the Thomas Fire tore through the creek bed and well into the adjacent area on their property and slammed into their home at rapid speed, destroying interior and exterior portions and destabilizing the foundation, as well as causing other severe damage to structures and landscaping. The Turners promptly notified their homeowners insurer, Chubb, and sought coverage. Yet Chubb dragged its feet, insisting that the home did not suffer a total loss and could be rebuilt as before — even though the building was uninhabitable as structurally unsound, and regulations adopted by FEMA and the County rendered a mere repair impossible — until finally relenting and acknowledging, 16 months after the mudslides, that the Turners' home was a total loss.

2. At that point, Chubb made a significant payment, and at Chubb's invitation the parties began discussing the full cost of replacing the home and, necessarily, additional payments to the Turners. The Turners provided Chubb with a detailed estimate demonstrating that rebuilding the home would cost an enormous sum, well more than what had already been paid but within policy limits.

3. Chubb then reversed course, commissioned an ostensible consultant to generate a phony and frivolous replacement cost estimate, and insisted — without any plausible support — that the home could be fully rebuilt for an amount that was *far*

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

*less* than what Chubb had even already paid, and far less than Chubb's own replacement cost estimate just a few years earlier. Chubb also failed to compensate the Turners for other components of their claim to which they were entitled. As a result of Chubb's refusal to fulfill its contractual obligations and its bad faith conduct, the Turners bring this lawsuit to obtain the benefits due to them under the subject insurance policy and otherwise to be made whole.

## PARTIES

4. Plaintiffs Lyle Turner and Alison Turner are husband and wife. They permanently reside in, and are citizens of, the State of California.

5. Plaintiffs are informed and believe, and on that basis allege, that Defendant Federal Insurance Company is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in Indianapolis, Indiana or, alternatively, in Whitehouse Station, New Jersey, or Warren, New Jersey.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction) because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the Turners' claims occurred in the County of Santa Barbara, California, which is within this judicial district.

## FACTUAL ALLEGATIONS

**The Mudslides and the Total Loss of the Turners' Home**

8. Since October 2013, the Turners have owned (through a trust) a house on a parcel of property in Montecito, California, as well as the parcel and other improvements. The Turners began living there in January 2015. Their home was built by a renowned architect. No expense was spared in the detail and design of the main residence or surrounding structures and landscaping.

9. In early December 2017, the Thomas Fire swept into Santa Barbara County, severely affecting residents of the Santa Barbara area, including Montecito. The Governor declared a State of Emergency for the County pursuant to the California Government Code. The Turners and their young son evacuated their home due to the smoke. They notified their homeowners insurer, Chubb.

10. The Thomas Fire ravaged the landscape in the mountains above the Turners' home. On or about January 9, 2018, during heavy rains in the area, massive flows of water and mud raced down the slopes at speeds of at least 15 miles per hour, ripping up trees, concrete, and boulders and driving them along their path. The debris flows hurtled down the creek bed in the Turners' property and a large swath of the area around it before slamming into their home. The flows caused devastating damage to the main residence and surrounding structures and landscaping. A nearly ten-ton truck was sent bowling towards the house, only to be stopped by a tree and a retaining wall. All of the Turners' personal effects in the house were completely destroyed, either immediately by the debris flows or in their aftermath. Some of the Turners' family photos were found miles away near the freeway.

11. The Turners were fortunate not to be at their home and therefore were not physically harmed. But their home was rendered uninhabitable and beyond repair. Windows were blown out, there were cracks running the length of the marble floors and the walls, and the building had become structurally unsound. It was self-evident that the entire house had undergone a total loss and would need to be demolished and entirely rebuilt or replaced, and that other structures and the landscaping also would need to be replaced.

**The Turners' Homeowners Insurance Policy with Chubb**

12. To protect their home and property, the Turners had purchased from Chubb a "Masterpiece" homeowners policy bearing Policy No. 14143029-01 with a policy period of October 30, 2017 to October 30, 2018 (the "Policy"). A true and correct copy of the Policy (with certain information redacted) is attached hereto as

3

**Exhibit 1**.  The Policy affords "Deluxe House Coverage" with a limit of $16,534,000 (subject to an adjustment for inflation) and "Deluxe Contents Coverage" with a limit of $6,613,600 (also subject to an adjustment for inflation), as specified in the Policy's Coverage Summary, as well as other coverages.  The Policy limit was determined by Chubb based on a replacement cost estimate Chubb commissioned in 2016, in connection with the Turners' purchase of the immediately preceding homeowners policy (incepting in October 2016).  The Turners paid Chubb nearly $60,000 in premium for the Policy.

13.   The Policy states:  "In Deluxe House Coverage, a 'covered loss' includes all risk of physical loss to [the Turners'] house or other property covered under this part of [the Turners'] Masterpiece Policy, unless stated otherwise or an exclusion applies."  The Policy similarly states:  "In Deluxe Contents Coverage, a 'covered loss' includes all risk of physical loss to [the Turners'] contents or other property covered under this part of [the Turners'] Masterpiece Policy, unless stated otherwise or an exclusion applies."

14.   With respect to the house, the Policy affords coverage for physical loss on an "extended replacement cost" basis.  This means that Chubb "will pay the reconstruction cost" of the house if damaged, but "[i]f the reconstruction cost . . . exceeds the amount of coverage for [the Turners'] house as shown in the Coverage Summary [($16,534,000, plus an inflation adjustment)], [Chubb] will pay up to 100% more than this amount of coverage, if necessary, for the reconstruction cost."  Subject to certain specified exceptions, "reconstruction cost" is defined as "the lesser of the amount required at the time of loss to repair, replace, or rebuild, at the same location, [the Turners'] house or any other permanent structure, using like design, and materials and workmanship of comparable kind and quality."

15.   "Reconstruction cost," as defined, does not include any amount required for certain specified reconstruction activities, namely:  "the excavation, replacement or stabilization of land under or around [the Turners'] house or any other permanent

4
COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

structure"; "conforming to any law or ordinance that regulates the repair, replacement, rebuilding, or demolition of [the Turners'] house or any other permanent structure"; and "removing the debris of a covered loss or the property that caused a covered loss." Instead, the Policy covers those amounts as "Extra Coverages" within the Deluxe House Coverage.

16. More specifically, the Policy's "rebuilding to code" coverage provides in pertinent part:

> After a covered loss, [Chubb] covers the necessary cost of conforming to any law or ordinance that requires or regulates:
> - the repair, replacement, or rebuilding of the damaged portion of [the Turners'] house or other permanent structure made necessary by the covered loss;
> - the demolition, replacement, or rebuilding of the undamaged portion of [the Turners'] house or other permanent structure necessary to complete the repair, replacement, or rebuilding of the damaged portion of [the Turners'] house or other permanent structure; or
> - the demolition of the undamaged portion of [the Turners'] house or other permanent structure when [the Turners'] house or other permanent structure must be totally demolished.
>
> . . . .
>
> If the loss is to [the Turners'] house only, or to [the Turners'] house and other permanent structure(s), [Chubb] will pay up to 100% of the amount of coverage for the house as shown in [the Turners'] Coverage Summary. If the loss is to an other permanent structure(s) only on the grounds of [the Turners'] house, [Chubb] will pay up to 100% of the amount of coverage for other permanent structures.
>
> If at the time of a covered loss, [the Turners'] coverage amount for [their] house or other permanent structures is increased because of the application of the

extended replacement cost payment basis, the 100% will be based on the increased amounts.

17. In addition, the Policy affords coverage for excavation, replacement or stabilization of land, as follows: "Whenever there is a covered loss to [the Turners'] house or other permanent structure and the related repair, replacement, or rebuilding requires excavation, replacement or stabilization of land under or around [the Turners'] house or other permanent structures, [Chubb] will pay the necessary cost for the excavation, replacement, or stabilization of the land. The amount of coverage is 10% of the amount of the covered loss to [the Turners'] house or other permanent structure, but not less than $10,000."

18. Coverage for other permanent structures on the property also is provided on an extended replacement cost basis. The Policy provides: "For each occurrence, we will pay up to a total of 20% of the amount of house coverage for the location at which a covered loss to these structures occurs, plus any additional amount of coverage shown in the Coverage Summary for 'other permanent structures' at this location. The same payment basis applies to other permanent structures as to the house itself."

19. Another Extra Coverage the Policy affords is for "additional living expenses," including "extra living expenses" and "forced evacuation expenses." Coverage for additional living expenses is provided up to a limit of 50% of the amount of house coverage for each occurrence (subject to any increased coverage amount due to application of the extended replacement payment basis).

20. The Policy describes extra living expenses in pertinent part as: "If a covered loss makes [the Turners'] house or other permanent structure uninhabitable, we cover the reasonable increase in [the Turners'] normal living expenses that is necessary to maintain [the Turners'] household's usual standard of living . . . ." The Policy specifies a formula for determining the time limit on payment of extra living expenses, although application of such time limit is subject to California law,

including without limitation California Insurance Code Section 2051.5. The policy also affords up to 30 days of coverage for forced evacuation expenses, which covers "the reasonable increase in [the Turners'] normal living expenses incurred by [the Turners] that is necessary to maintain [the Turners'] household's usual standard of living" where they have "evacuate[d] [their] house or other permanent structure due to a reasonable threat of a loss covered under this policy" or have been "forced to evacuate by a civil authority as a direct result of a covered peril . . . ."

21. With respect to landscaping, under the Policy, Chubb "cover[s] trees, shrubs, plants, and lawns, which are on the grounds of [the Turners'] house and other permanent structures, against certain kinds of perils," including fire. Coverage is up to a total of 5% of the amount of coverage for the house, including the increased amount of coverage on an extended replacement cost basis, subject to a limit of $10,000 for any one tree, shrub, or plant.

22. The Policy provides coverage for "contents," defined as personal property that the Turners or a family member owns or possesses, on a replacement cost basis, up to a limit of $6,613,600, plus an inflation adjustment. This means in pertinent part that Chubb "will pay the full cost to replace the contents without deduction for depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage." If the payment basis on the house is increased to reflect extended replacement cost coverage, the limit on the contents coverage is increased commensurately: "If a change in the amount of coverage for [the Turners'] house is made, including the application of the extended replacement cost payment basis, the amount of coverage for contents will be adjusted proportionately."

**Chubb's Extended Delay in Acknowledging the Total Loss of the Turners' Home**

23. The Turners notified Chubb of the destruction to their home and other property due to the January 2018 debris flows. Chubb was well aware of the extreme impact of the Thomas Fire and other wildfires on its policyholders: among other things, Chubb was one of the insurance companies that agreed to the California

7

Insurance Commissioner's request to pay 50% of the contents limits for its insureds who experienced a total loss without requiring them to supply a detailed inventory. Chubb acknowledged the Turners' claim. Little did the Turners know at the time that this would be the beginning of a lengthy ordeal to secure the full amount of coverage to which they were entitled under the Policy.

24. From the start, Chubb set out to try to insist, against all available facts and evidence, that all the Turners' home needed was mere repair, at a tiny fraction of the cost of having to demolish it and rebuild or replace it. The Turners retained a structural engineer and established to Chubb that the house could not merely be repaired because structural instability rendered it uninhabitable; the house would need to be torn down and rebuilt or replaced. Indeed, within two weeks of the debris flows, the County had "red-tagged" the house as unsafe, and the County noted damage of 60% to 100% of the structure. The County Assessor also issued a property reassessment notice designating the value of the home at $0. The Turners further established to Chubb that, due to a change by FEMA in the base flood elevation applicable to the property's location and related County regulations, given the extent of the damage, the County would not allow the Turners merely to repair the house as Chubb urged.

25. Chubb nevertheless remained steadfast in contending that the house could be merely repaired. Chubb evidently was comfortable with placing the Turners and their young son in harm's way by urging that they could reside in a structurally unsound home, in an area the County had designated as being at extreme risk of future debris flows and flooding, even as Chubb did not attempt a serious rebuttal to the Turners' structural engineer's conclusions.

26. The Turners, both directly and through counsel, were forced to engage in numerous exchanges with Chubb in an effort to convince it otherwise. They supplied all requested information and were forthcoming with both the factual and evidentiary support and the legal bases for their position. The Turners and Chubb also executed a

1  Tolling and Standstill Agreement, which provided in pertinent part: "All statutes of
2  limitation, statutes of repose, and any other limitation applicable to the passage of
3  time . . . that may apply to any claims that any or all of the Turners can or could assert
4  against Federal . . . relating in any way to the [Policy or a subsequent Chubb policy]
5  are tolled for a period of two years from the date of first loss, December 7, 2017,"
6  unless the agreement is terminated earlier, which it never was.

7       27.    In addition, the Turners expressly requested approval to retain an
8  architect and civil, geotechnical/soils, structural, and environmental engineers as
9  necessary, to be paid for by Chubb, to examine the requirements to reconstruct their
10 home on the subject site, as well as to prepare a necessary code analysis. Chubb
11 declined to grant their request.

12      28.    Ultimately, in May 2019, 16 months after the Thomas Fire-generated
13 debris flows had visited devastation upon the Turners' home and property, Chubb
14 finally conceded that the structure was a total loss. Chubb agreed to pay, and did pay,
15 the amount of the limit for the house stated in the Policy's Coverage Summary, plus
16 an inflation adjustment, subject to the parties' mutual understanding that the actual
17 cost of rebuilding or replacing the home — and hence any additional payments to the
18 Turners under the Policy's extended replacement cost and rebuilding to code
19 coverages — remained to be determined.

20      29.    The Turners also submitted a detailed inventory for their contents claim
21 with specific replacement cost amounts for each line item and extensive backup
22 documentation, which the Turners had retained a consultant to prepare at significant
23 out-of-pocket cost to them. Despite Chubb's agreement to abide by the California
24 Insurance Commissioner's request and to pay 50% of its policyholders' contents
25 limits in the event of a total loss without requiring a detailed inventory (which the
26 Turners nevertheless supplied), Chubb advised that it would not pay the full
27 replacement cost figure that the Turners calculated, but instead would pay an amount
28 well under 50% of the Policy's contents limit. Ultimately, six months later, after the

Turners pressed the matter, Chubb agreed to pay an additional amount that would bring its total payment to 50% of the basic contents limit on the face of the Policy, although Chubb failed to include the required inflation adjustment. (The amount Chubb agreed to pay also did not represent 50% of the limit adjusted for payment on the house on an extended replacement cost basis.) But Chubb still has not paid the full amount of the contents claim the Turners submitted.

**Chubb's Bad Faith Refusal to Pay the Full Cost of Replacing the Turners' Home**

30. In connection with Chubb's belated, albeit welcome, total loss acknowledgment in May 2019 and payment of the basic replacement cost limit, Chubb invited the Turners to evaluate and discuss their plans for rebuilding or replacing the house, as well as addressing other unresolved claim items. Chubb indicated that it was receptive to paying additional amounts under the Policy, which necessarily would have been within the replacement cost coverage and/or the rebuilding to code coverage.

31. California Insurance Code Section 2051.5(c) gave the Turners the right to rebuild or replace their home at another location and receive full extended replacement cost and rebuilding to code coverage under the Policy, up to the amount that it would cost to rebuild or replace the existing structure at its original location. Accordingly, it was important for the Turners to arrive at a reasonable estimate of the cost to rebuild or replace the existing structure at its original location on the property, even if actually rebuilding or replacing it at that location was not a practical option. Indeed, given the anticipated enormous outlay to rebuild or replace their home, whether at a different location on the premises or at an altogether different parcel, the Turners required a commitment from Chubb as to at least an approximate amount, reflective of the real reconstruction cost, that Chubb would be willing to fund.

32. In a telephone call in early August 2019, adjusters for Chubb offered to provide a rough estimate of the replacement cost to move the discussions with the Turners forward. The Turners (including their counsel) responded that, instead, it

10
COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

might be more productive for the Turners to prepare and submit a rough replacement cost estimate because they were concerned that Chubb did not fully appreciate the magnitude of the cost and scope of replacement, due to, among other things, the caliber of materials and workmanship of the existing home, the nature of labor and materials costs in Montecito specifically, and the costs of various code upgrades and administrative reviews of any replacement project.  The Turners expressly stated on the call that there would be costs associated with complying with the base flood elevation or advisory flood elevation imposed by the County in light of the new FEMA flood maps.  The Turners expressly noted that such a replacement cost estimate was relevant to the limit of insurance proceeds they would have at their disposal to rebuild or replace their home pursuant to California law (Insurance Code Section 2051.5(c)), and that such information was important to their decision-making.  The next day, the Turners sent an email to Chubb indicating that they thought procuring an analysis or report from an expert Montecito-based builder might be more productive in determining a reasonably accurate actual replacement cost estimate for the home and property, including in the area of code compliance.

33.  Consequently, the Turners commissioned a highly experienced Montecito-based builder and his construction and design firm to undertake a replacement cost estimate based on rebuilding the exact same house (and related structures and landscaping) at the exact same location, without regard to whether the County would actually allow such a project at that spot.  Although the original intent was for the estimate to be rough and preliminary, the builder and his design firm in fact undertook a far more thorough investigation of the actual labor and material costs required for such a project, including contacting individuals involved in the original construction of the home to determine exact types of marble and other materials and ascertaining their current replacement costs.  The firm generated a detailed and well-supported replacement cost report dated September 5, 2019, showing actual full

replacement cost at an amount far higher than what Chubb had paid to date. The Turners provided that report to Chubb the next day.

34. For about six weeks, the Turners heard nothing from Chubb about their report. Chubb did not ask any questions or request any information. Then, on October 16, 2019, Chubb sent the Turners a letter containing a series of misstatements. Among other things, Chubb erroneously claimed that the Turners' expert builder's estimate contemplated rebuilding the home at a site that was different than the existing location; suggested that the parties had never discussed the cost of rebuilding to comply with existing code; and intimated that there was no coverage for excavation, replacement, and stabilization of land under the Turners' home.

35. Even worse, with its October 16, 2019 letter, Chubb supplied an ostensible replacement cost estimate (which Chubb characterized as a "rough order of magnitude" estimate) from an out-of-area construction consulting firm that purported to value replacement cost at $10.17 million — about $6.5 million less than what Chubb itself had determined replacement cost would be at the time it sold the Turners the Policy, and about $6.5 million less than what Chubb had already paid. Chubb's replacement cost estimate was frivolous on its face: the values and percentages it supplied for various reconstruction activities had no relation to reality for such a project in Montecito, it disregarded the supreme quality of many of the finishings that added significant cost, and it was unreflective of any thoughtful process of undertaking a complete, like-for-like rebuilding. Moreover, Chubb's adherence to a replacement cost estimate that was about $6.5 million less than the amount Chubb told the Turners when it sold them the Policy implied that, if Chubb actually believed that replacement cost was so much less, Chubb had defrauded the Turners in the sale of the Policy by charging them far more premium than they should have paid.

36. Chubb's October 16, 2019 letter identified several supposed discrepancies or unsupported figures in the Turners' builder's report — even though Chubb had not asked them about these items and they all were easily explainable. The

1    letter then essentially curtailed any meaningful discussion of the actual replacement
2    cost while insisting on knowing the Turners' plans going forward.  The letter stated:

> Based on the current discrepancies, we will be unable to move forward with the initial path discussed. With that being said, we will need to know the insured's plan for reconstruction or relocation to continue evaluation of any claimed costs for Dwelling/House Extended Replacement Costs. Once their plan is presented, [Chubb] will advise you of our next step(s) to evaluate the potential replacement cost, which [Chubb] current [*sic*] estimates as not exceeding their coverage limit. Additionally, we require their decision to extend temporary housing past June 2020.

37.     The Turners responded with a letter through their counsel on December 5, 2019.  Their letter refuted each one of the points in Chubb's October 16, 2019 letter.  Their letter also enclosed a supplemental letter from their expert builder dated December 2, 2019, which similarly addressed and refuted all of Chubb's contentions as to supposed discrepancies in the September 5, 2019 estimate and noted that Chubb's consultant's report had little basis in reality.  The Turners' letter explained that it was difficult to perceive how having another telephone call with the Turners, as Chubb had recently requested, would be productive as long as Chubb continued to advance unreasonable and unsupported positions on the claim.

38.     Chubb did not respond to the Turners' December 5, 2019 letter.  On January 6, 2020, the Turners, through counsel, emailed Chubb to follow up.  Their email also advised that Chubb should consider the Turners' expert's September 5, 2019 replacement cost estimate "as representing the Turners' claim for loss with respect to the main dwelling and the other items identified therein."

39.     On January 9, 2020, Chubb sent the Turners a letter — at this point, more than four months after the Turners had submitted their detailed replacement cost estimate dated September 5, 2019 — that avoided providing any substantive response. With respect to replacement cost, the letter stated only, in two sentences, that Chubb

"continues to review [the Turners' December 5, 2019 letter] and accompanying materials" and that it had requested that its consultant (which had generated the frivolous replacement cost estimate) "analyze the materials." Chubb nevertheless reiterated its request for a telephone call, despite failing to address any of the Turners' points substantively or to display any willingness to revisit its existing positions.

40. The Turners, through counsel, responded by letter dated January 14, 2020. Their letter addressed all salient points, explained again why the Turners did not perceive how a telephone call would be productive given Chubb's position and disregard of the Turners' points, and requested a substantive response to their prior submissions within a week. Chubb finally responded on January 23, 2020, but its letter set out a series of incoherent and misleading statements and provided no timeline for a substantive and meaningful response to, or consideration of, the Turners' replacement cost estimate.

41. To date, Chubb has declined to pay anything more than it already has paid for the Turners' claim resulting from the debris flows, including for the Turners' house, other structures, land restoration, landscaping, contents, and additional living expenses, even though the Turners are entitled to recover substantially more under the terms of the Policy and applicable law. Chubb also has failed to reimburse the Turners for their expenditures for emergency clean-up and salvage and for structural examination at the property that Chubb requested the Turners to undertake in the aftermath of the debris flows.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

42. The Turners re-allege and incorporate by reference Paragraphs 1 through 41 as though fully set forth herein.

43. The Policy is a valid and binding contract of insurance between the Turners and Chubb. The Turners did all, or substantially all, of the significant things the Policy required them to do. (Chubb has never requested that the Turners submit a

proof of loss for any of their claims under the Policy.)  Chubb breached its contractual obligations under the Policy by, without limitation, failing to pay the Turners benefits due to them under the Policy and by indicating that it would not pay them such benefits.  The Turners have been harmed as a result of Chubb's breach of its contractual obligations under the Policy by, without limitation, being deprived of the insurance proceeds for their losses, for which they paid substantial premium.

### SECOND CLAIM FOR RELIEF

**Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing**

44. The Turners re-allege and incorporate by reference Paragraphs 1 through 43 as though fully set forth herein.

45. Implied in the Policy is a covenant by the Insurer that it will act in good faith and deal fairly with its insureds; that it will do nothing to interfere with the right of its insureds to receive the benefits of the Policy; that it will place the interests of its insureds before its own interests; that it will exercise diligence, good faith and fidelity in safeguarding its insureds' interests; that it will deal ethically with its insureds and will fairly and adequately inform its insureds with respect to the nature and scope of its insurance coverage.

46. Chubb has tortiously breached the implied covenant of good faith and fair dealing in the Policy by, among other things, the actions and omissions described above, including without limitation:

   a. Unreasonably delaying its adjustment of the Turners' claim, even after conceding that the Turners had suffered a total loss of their home;

   b. Refusing to consider seriously the Turners' September 5, 2019 replacement cost estimate, including mischaracterizing the nature of the estimate and failing to ask for any clarification before asserting meritless critiques of it;

      c.      Enlisting a purported consultant to generate a frivolous replacement cost estimate having no meaningful relation to reality, and then insisting that the total replacement cost was around $6.5 million less than the amount of Chubb's prior replacement cost estimate and the amount it had already paid the Turners;

      d.      Consistently avoiding answering the Turners' direct questions and points and deferring disclosure of any further consideration of the Turners' claim until some unspecified time after the Turners would have a fruitless telephone call with Chubb;

      e.      Failing to conduct an adequate investigation of the claim and asserting grounds to limit or avoid coverage based on its inadequate investigation;

      f.      Splitting the Turners' claim into two separate claims (one for the smoke from the Thomas Fire and one for the mudslides) and consequently applying the Policy's $25,000 deductible unfavorably, even after advising the Turners that all of the loss would be treated as a single claim;

      g.      Giving greater consideration to its own interests than it gave to the Turners' interests; and

      h.      Leaving the Turners no choice but to initiate this litigation in order to obtain the benefits to which they are entitled under the Policy.

47.    By reason of Chubb's wrongful conduct in tortiously breaching the implied covenant of good faith and fair dealing, the Turners have sustained damages in an amount to be proven at trial, including without limitation the benefits to which they are entitled under the Policy and attorneys' fees and other expenses incurred in pursuing coverage under the Policy.

48.    Chubb has acted towards the Turners in a despicable manner with a willful and conscious disregard for the Turners' rights. Chubb's conduct constitutes

16

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

oppression, fraud, or malice and justifies punitive or exemplary damages, in an amount to be determined at trial, sufficient to punish Chubb for its despicable conduct and to deter Chubb and others from engaging in similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, the Turners pray for relief against Chubb as set forth below:

a. Compensatory and consequential damages according to proof at trial, including without limitation attorneys' fees and other expenses incurred by the Turners in pursuing benefits under the Policy;

b. Punitive and exemplary damages;

c. Prejudgment and post-judgment interest as allowed by law;

d. Costs of suit; and

e. Such other and further relief as may be just and proper.

DATED: January 28, 2020          BLANK ROME LLP


By: /s/ David A. Thomas
    David A. Thomas
    Sarah L. Edri

Attorneys for Plaintiffs
Lyle Turner and Alison Turner

//
//

# DEMAND FOR JURY TRIAL

Plaintiffs Lyle Turner and Alison Turner hereby demand trial by jury of all issues and claims for relief that may be so tried as of right.

DATED: January 28, 2020         BLANK ROME LLP

By: /s/ David A. Thomas
    David A. Thomas
    Sarah L. Edri

Attorneys for Plaintiffs
Lyle Turner and Alison Turner